

U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2022 MAR 30  P 2: 24

CAROL L. MICHEL

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

# FELONY

## SUPERSEDING BILL OF INFORMATION FOR
## BRIBERY AND CONSPIRACY TO DEFRAUD THE UNITED STATES

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 20-134 |
| v. | * | SECTION: M (3) |
| ELDRIDGE JOHNSON | * | VIOLATIONS: 18 U.S.C. § 201(b)(2)(B) |
| | | 18 U.S.C. § 371 |
| | * | |

\* \* \*

The United States Attorney charges that:

## COUNT 1
### (Bribery)

**A.    AT ALL TIMES MATERIAL HEREIN:**

1.    The United States Coast Guard was an agency of the United States government charged with, among other things, the superintendence of the U.S. Merchant Marine. In executing this responsibility, the Coast Guard prescribed regulations and developed policy to ensure that maritime vessels were safely manned with qualified and competent mariners.

2.    The United States Coast Guard's governmental functions, as authorized by federal statutes and regulations ("federal law"), included, among other things, the administration,

Fee_____ usk
Process_____
X_Dktd_____
___CtRmDep_____
___Doc.No._____

regulation, and enforcement of the regulations and laws relating to the issuance of merchant mariner credentials ("MMCs") and related endorsements, including the applications and examinations associated with MMCs and endorsements.

3.      Under federal law, all mariners employed aboard United States merchant vessels greater than 100 gross registered tonnage, with a few limited exceptions, were required to have valid MMCs. Furthermore, to serve in various positions, federal law required mariners to have particular endorsements added to their MMCs.

4.      In order to obtain an MMC, a mariner was required to meet various requirements and to take an oath, promising to faithfully and honestly perform all the duties required by the laws of the United States.

5.      Endorsements determined what position mariners could work, on what kind of vessels, and in what waters. The presence of an endorsement on an MMC indicated that the mariner was qualified to serve in the specified capacity and had met all legal requirements for that endorsement. Federal law prohibited a mariner from serving in a position for which the mariner lacked the required endorsement. Similarly, federal law prohibited a business from employing a mariner in a position for which the mariner lacked the required endorsement.

6.      Endorsements were generally divided into two categories: rating endorsements and officer endorsements. Rating endorsements related to lower-level positions on vessels, such as able seaman and qualified member of the engine department. Officer endorsements related to the higher- and highest-level positions on vessels, and included, among other positions, the following:

(a)      *master* (also known as the captain, the officer having command of a vessel, ultimately held responsible for the safety of the crew, vessel, cargo and all aspects of the vessel's operation);

(b)     *chief mate* (the officer in charge of the deck department, typically responsible for, among other things, navigation, keeping watch of the bridge, cargo, stability calculations, being the medical person in charge, and assuming command of the vessel if the master is unable to fulfill the master's duties);

(c)     *second mate* (second only to the chief mate in the deck department, typically responsible for, among other things, being the navigation officer, voyage plans, keeping watch of the bridge, and maintaining lifesaving equipment);

(d)     *third mate* (typically responsible for, among other things, navigation, keeping watch of the bridge, and maintaining fire safety equipment);

(e)     *chief engineer* (the officer in charge of the engine department, typically responsible for, among other things, all operations and maintenance having to do with engineering and mechanical equipment throughout the ship);

(f)     *first assistant engineer* (second only to the chief engineer in the engine department, typically responsible for, among other things, the upkeep of machinery, the manning and supervision of the engine room, and keeping watch of the engine room);

(g)     *second assistant engineer* (typically responsible for, among other things, keeping watch of the engine room, being in charge of transferring fuel, fuel operations, and fuel oil purifier, and overseeing a particular area of the engine department such as generators or boilers);

(h)     *third assistant engineer* (typically responsible for, among other things, keeping watch of the engine room, and overseeing generators, the sewage system, and lube oil purifier).

7.      For many endorsements, federal law required mariners to pass United States Coast Guard-administered examinations. These examinations tested mariners' knowledge and training to safely operate under the authority of the endorsements. The examinations, which typically consisted of numerous separately-graded modules, were administered at United States Coast Guard regional exam centers. One such regional exam center, known as REC New Orleans, was located in Mandeville, Louisiana, in the Eastern District of Louisiana. United States Coast Guard employees at the regional exam centers entered the scores into a United States Coast Guard computer system used to manage the issuance of credentials to mariners and to process applications for MMCs and endorsements.

8.      In some situations, passing an examination for one endorsement could enable a mariner to obtain one or more additional endorsements. This could occur, for example, if the examination fulfilled a requirement for an additional endorsement or if obtaining the tested-for endorsement fulfilled a requirement for an additional endorsement.

9.      **ELDRIDGE JOHNSON** was employed by the United States Coast Guard as an examination administrator at REC New Orleans until his retirement in or about January 2018. As an examination administrator, **ELDRIDGE JOHNSON's** official duties included, among other things, honestly administering and proctoring examinations, entering examination scores and other mariner information in a United States Coast Guard computer system, and reporting examination results and other mariner information to a United States Coast Guard office that issued endorsements.

10.     Dorothy Smith was employed by the United States Coast Guard as a credentialing specialist at REC New Orleans until in or about August 2019. In that position, Dorothy Smith's official duties included, among other things, processing merchant mariner credential applications.

As a credentialing specialist, Dorothy Smith was also authorized to perform the duties of an examination administrator.

**B.     THE SCHEME:**

Beginning in a year unknown, but no later than 2011, and continuing until in or about January 2018, in the Eastern District of Louisiana and elsewhere, **ELDRIDGE JOHNSON ("JOHNSON")** knowingly and willfully engaged in a scheme to corruptly demand, seek, receive, accept, and agree to receive and accept money in return for being influenced to commit and aid in committing and to collude in, and allow, and to make opportunity for the commission of a fraud on the United States Coast Guard.

It was part of the scheme that **JOHNSON** informed credential applicants that he would, in exchange for money, enable credential applicants to improperly obtain passing examination scores and endorsements.

It was part of the scheme that **JOHNSON** offered and provided, in exchange for money, various forms of improper assistance to credential applicants, including the reporting of false information to the United States Coast Guard and, more commonly, providing applicants with written examination questions and answers prior to their examinations.

It was part of the scheme that **JOHNSON**, without authorization, removed confidential United States Coast Guard examination and answer documents from REC New Orleans for the purpose of selling said documents to credential applicants.

It was part of the scheme that **JOHNSON** recruited credential applicants to engage in the scheme by approaching them when they appeared at the New Orleans REC and by calling their telephone contacts numbers listed in United States Coast Guard records.

It was part of the scheme that **JOHNSON** recruited credential applicants to engage in the scheme by encouraging applicants who participated in the scheme to refer other applicants to **JOHNSON**.

## C.    THE OFFENSE:

From March 2017 to on or about April 9, 2017, in the Eastern District of Louisiana, **ELDRIDGE JOHNSON**, a public official, directly and indirectly did corruptly demand, seek, receive, accept, and agree to receive and accept something of value personally, in return for being influenced to commit and aid in committing and to collude in, and allow, and to make opportunity for the commission of a fraud on the United States; that is **ELDRIDGE JOHNSON** corruptly demanded, sought, received, accepted, and agreed to receive and accept money, in the form of a $500 money order from credential applicant A.W., which **JOHNSON** deposited into his bank account on or about April 9, 2017, in return for agreeing to use his position as a United States Coast Guard employee to enable A.W. to obtain a merchant mariner credential endorsement to which A.W. was not lawfully entitled.

All in violation of Title 18, United States Code, Section 201(b)(2)(B).

### COUNT 2
### (Conspiracy to defraud the United States)

## A.    AT ALL TIMES MATERIAL HEREIN:

The allegations contained in Section A of Count 1 are re-alleged and incorporated as if fully set forth herein.

## B.    THE CONSPIRACY:

Beginning in or about January 2018, and continuing until in or about May 2019, in the Eastern District of Louisiana and elsewhere, **ELDRIDGE JOHNSON**, Dorothy Smith, and others knowingly and willfully conspired and agreed together and with each other, and with other persons

both known and unknown to the grand jury, to defraud the United States of and concerning its governmental functions and rights, hereafter described, that is:

(a)    of and concerning its right to have its business and its affairs, and particularly the transaction of the official business of the United States Coast Guard (including official business related to examinations that tested merchant mariners' knowledge and training to safely operate under the authority of endorsements), conducted honestly and impartially, free from corruption, fraud, improper and undue influence, dishonesty, unlawful impairment, and obstruction;

(b)    of and concerning its right to have its officers and employees, and particularly the personnel of the United States Coast Guard, free to transact the official business of the United States unhindered, unhampered, unobstructed, and unimpaired by the exertion upon them of dishonest, corrupt, unlawful, improper and undue pressure and influence;

(c)    of and concerning its right and governmental function of issuing MMCs and related endorsements through and by means of its officers and employees in the United States Coast Guard unhindered, unhampered, unobstructed, and unimpaired by the exertion upon such officers and employees of dishonest, unlawful, corrupt, improper and undue pressure and influence; and

(d)    of and concerning its right to the conscientious, loyal, faithful, disinterested, and unbiased services, decisions, actions, and performance of their duties by Dorothy Smith in her official capacity as a United States Coast Guard employee free from corruption, partiality, improper influence, bias, dishonesty, and fraud.

C.    **MANNER AND MEANS OF THE CONSPIRACY:**

1.    It was a part of the conspiracy that **ELDRIDGE JOHNSON ("JOHNSON")** and other conspirators would by deceit, craft, trickery, and dishonest means, defraud the United States by interfering with and obstructing the lawful governmental functions of the United States Coast

Guard, in that **JOHNSON** and other conspirators would cause to be reported to the United States Coast Guard false representations that credential applicants had appeared for examinations, had passed examinations, had achieved certain examination module scores, had fulfilled certain requirements for endorsements, and should receive certain endorsements and credentials.

2.      It was further a part of the conspiracy that Dorothy Smith, in her position as a United States Coast Guard employee, would falsely report to the United States Coast Guard that credential applicants had appeared for examinations required for certain endorsements, had passed such examinations, had achieved certain examination module scores, had fulfilled certain requirements for endorsements, and should receive certain endorsements.

3.      It was further a part of the conspiracy that Dorothy Smith would demand, seek, receive, accept, and agree to receive and accept money in return for falsely reporting to the United States Coast Guard that credential applicants had appeared for examinations required for certain endorsements, had passed such examinations, had achieved certain examination module scores, had fulfilled certain requirements for endorsements, and should receive certain endorsements.

4.      It was further a part of the conspiracy that Dorothy Smith would interact directly with coconspirator credential applicants.

5.      It was further a part of the conspiracy that Dorothy Smith would use a network of intermediaries to communicate with, and receive money from, coconspirator credential applicants.

6.      It was further a part of the conspiracy that **JOHNSON**, following his employment with the United States Coast Guard, and others were part of Dorothy Smith's network of intermediaries.

7.      It was further a part of the conspiracy that **JOHNSON** and others would directly and indirectly solicit and recruit credential applicants to participate in the conspiracy.

8.      It was further a part of the conspiracy that **JOHNSON** and others would directly and indirectly demand, seek, receive, accept, and agree to receive and accept money from credential applicants in return for causing, and for agreeing to cause, false reports to the United States Coast Guard that said credential applicants had appeared for examinations required for certain endorsements, had passed such examinations, had achieved certain examination module scores, had fulfilled certain requirements for endorsements, and should receive certain endorsements.

9.      It was further a part of the conspiracy that **JOHNSON** and others would directly and indirectly communicate to Dorothy Smith the identities of coconspirator credential applicants that desired false reports to be made to the United States Coast Guard for the purpose of said applicants obtaining MMC endorsements.

10.     It was further a part of the conspiracy that **JOHNSON** and others would directly and indirectly, corruptly give, offer, and promise money to Dorothy Smith, in exchange for Dorothy Smith falsely reporting, and agreeing to falsely report, to the United States Coast Guard that credential applicants had appeared for examinations required for certain endorsements, had passed such examinations, had achieved certain examination module scores, had fulfilled certain requirements for endorsements, and should receive certain endorsements.

11.     It was further a part of the conspiracy that coconspirator credential applicants used endorsements obtained through Dorothy Smith's false reports to obtain additional unearned endorsements.

12.     It was further a part of the conspiracy that coconspirator credential applicants applied for and obtained renewal MMCs and duplicate MMCs containing unearned endorsements.

13.     It was further a part of the conspiracy that coconspirator credential applicants obtained unearned endorsements through Dorothy Smith's false reports for positions including, among others, master, chief mate, second mate, third mate, chief engineer, first assistant engineer, second assistant engineer, and third engineer, including such endorsements that imposed no limitation as to vessel weight and vessel horsepower.

**D.     OVERT ACTS:**

In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Eastern District of Louisiana and elsewhere:

**ELDRIDGE JOHNSON** caused Dorothy Smith to enter numerous false reports that applicants had passed examinations, with each false report resulting in the issuance an unearned officer-level endorsement, including a false report entered on or about May 1, 2019, at REC New Orleans.

On or about May 1, 2019, **ELDRIDGE JOHNSON** paid approximately $1,000 to Dorothy Smith via an electronic money transfer, which Dorothy Smith received in the Eastern District of Louisiana, for the purpose of a credential applicant obtaining false passing examination scores.

All in violation of Title 18, United States Code, Section 371.

**NOTICE OF FORFEITURE**

1.     The allegation of Count 1 of this Superseding Bill of Information is incorporated by reference as though set forth fully herein for the purpose of alleging forfeiture to the United States.

2.     As a result of the offense alleged in Count 1, the defendant, **ELDRIDGE JOHNSON**, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to said offense.

3.      If any of the above-described property, as a result of any act or omission of the

defendant:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third person;

      c.      has been placed beyond the jurisdiction of the Court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property which cannot be subdivided

          without difficulty;

the United States shall seek a money judgment and, pursuant to Title 21, United States Code,

Section 853(p), forfeiture of any other property of the defendant up to the value of said property.


DUANE A. EVANS
UNITED STATES ATTORNEY


CHANDRA MENON
Assistant United States Attorney


New Orleans, Louisiana
March 30, 2022


11

No. 20-134, M (3)

# United States District Court

### FOR THE

EASTERN _____ DISTRICT OF _____ LOUISIANA

UNITED STATES OF AMERICA

vs.

ELDRIDGE JOHNSON

SUPERSEDING BILL OF INFORMATION
FOR BRIBERY AND FOR CONSPIRACY
TO DEFRAUD THE UNITED STATES

Violations:  18 U.S.C. § 201(b)(2)(B)
18 U.S.C. § 371

Filed _____, 20 _22_

_____, Clerk.

By _____, Deputy

CHANDRA MENON
Assistant United States Attorney